109   401
f130  355

ESTHER D. SYLVESTER v. DOUGLAS SYLVESTER, Appellant.

**Divorce :** LENGTH OF RESIDENCE : *Jurisdiction*.   Under Code, section 1 3171, relating to divorces and giving jurisdiction thereof to the district court of the county in which either party resides, residence need not be for the length of time prescribed by Constitution, Article 2, section 12, to give the right to vote.

'PLEADING: *Motion to change place of trial*.   Such motion is not to be 2 granted simply because affidavit is made that the mover is a resident of another county, there being no recital of fact to sustain said conclusion.

*Evidence held insufficient*.   Plaintiff cannot have divorce where her life at no time has been endangered by defendant's treatment 3 though he has been guilty of unmanly and brutal conduct in connection with her equally reprehensible conduct.

*Appeal from Greene District Court.*—HON. Z. A. CHURCH, Judge.

THURSDAY, OCTOBER 19, 1899.

ACTION in equity for a divorce.   There was a hearing on the merits, and a decree for the plaintiff as prayed. The defendant appeals.—*Reversed*.

*M. R. & J. B. McCrary* for appellant.

*Rose & Henderson* for appellee.

ROBINSON, C. J.—The plaintiff and the defendant were married to each other on the 6th day of April, 1897, and from that time until the 3d day of the next November lived together on a farm in Calhoun county.   On the last-named date the plaintiff left her husband, and now seeks a divorce on the ground that he has been guilty of such inhuman treatment as to endanger her life.

I.   This action was commenced in Greene county on the 15th day of December, 1897.   Before answering, the defendant filed a motion for a change of the place of trial

to Calhoun county. The theory of the motion is that sixty days' residence in Greene county after the separation was required to enable the plaintiff to maintain this action in that county, and the petition shows that the action was commenced less than sixty days after the plaintiff left Calhoun county. The motion was overruled. The petition shows that the plaintiff has been a resident of Greene county since the year 1883, excepting the time during which she lived with her husband in Calhoun county, and that when the petition was filed she resided in Greene county. Section 3171 of the Code, which relates to divorces, is as follows: "The district court in the county where either party resides has jurisdiction of the subject-matter of this chapter." It was said in *Whitcomb v. Whitcomb*, 46 Iowa, 437, that the residence contemplated was not merely temporary, but that it should be fixed, without any intention of changing it. Mere length of time during which a person has lived in a particular locality is not controlling, and if he remain there longer than the period of time required to give him a legal residence, but without any intention of making it his permanent place of residence, he does not become a resident thereof, within the meaning of the law. *Hinds v. Hinds*, 1 Iowa, 36. Section 1 of article 2 of the constitution of this state prescribes the residence necessary to give a citizen of the United States the right to vote in this state, but does not fix the residence which is necessary to give a court jurisdiction of an action for divorce. The general rule that the domicile of the husband is the domicile of the wife does not apply in proceedings for divorce, the law recognizing the right of the husband and wife to have separate domiciles where there is legal ground for separation. *Kline v. Kline*, 57 Iowa, 386. The petition alleged sufficient grounds for a divorce, and that the plaintiff was a resident of Greene county. The motion for a change of the place of trial was supported by an affidavit which alleged, among other things, that the "plaintiff is a

resident of Calhoun county," but that was a conclusion not sustained by any recital of facts, and was not sufficient to overcome the averments of the petition. We conclude that the motion was properly overruled.

II. The plaintiff testifies that after she and her husband had lived together about one month they had a disagreement in regard to the purchase of two cows; that he was not able to buy them, and that she told him she would pay for them, but would have to wait a month or two for the money; that at a later time he asked her if she would go with him for the cows, and she answered that she would; that he then said he guessed he would write a note, and wrote one, and asked her to sign it. She further says: "I was thunderstruck. I did not suppose I would have to sign anybody else's note when I could pay for the cows myself. I told him, 'Yes; I would sign that note, but I would never sign another.' He swore at me." The plaintiff further testifies that in July or August her husband became very angry, and told her to leave; that she started to do so, and he came after her and pushed her; that the bedroom door was open, and he pushed her through it, and she struck her head on a sharp corner at the foot of the bed; that the injury made her sick, and affected the use of an eye; that upon one occasion he kept her up until 3 o'clock in the morning because he wanted her to sleep in a certain place, and she caught cold, and could not speak louder than a whisper for two weeks; that he choked her not less than a half a dozen times; that in October she was visited by a niece, and, as there were but two beds, she asked her husband, as an accommodation, to sleep with a boy who was staying with them; that he answered he did not know whether he would or not; that he "grabbed up the bedclothes, and went and slept in the bedroom"; that the next night, after she had retired, he came to her room, and ordered her to go to the other room; that she told him she "had no intention of doing so"; that he dragged all the bedclothes from

the bed, dragged her out, and threw her out of the door, and then threw a sheet-iron basket onto her, and kept her out in her nightclothes at about 9 o'clock at night. She further states that "he swore at me, and told me if I did no go to the other room I was fired. When he dragged me out, he told me never to return. He told me if I did not do as he wished I was fired instanter. He used to say he would take me to Lake City or Rockwell City to go. He became more and more brutal. He struck me more than once, I guess.   *   * * He swore at me. He called me a 'God damned liar,' and 'a son of a bitch,' and a 'fool,' and a 'horse's ass.' I never heard such profane language. I could not remember it, and would not try. He threatened to kill me. He said, 'God damn you, I will knock your brains out;' and he tried to. He came at me with an ear of corn in his hands, and threatened to knock my brains out. He threw a knife at me that just barely missed me,—a case knife he was using at the table. He threw a glass of water at my face. He was ill mannered. He threw a chicken that was cooked— prepared—at me. He most generally prepared himself for dinner by changing his clothes. That morning he refused to. I said something to provoke him. He threw the chicken all over me. Some went on the wall, some on the floor, and some over me." The plaintiff further testifies that she was terrified by the conduct of the defendant; that she was afraid of her life, and did not know at what moment he might fly at her and endanger her life; that she treated him as well as she knew how, and did not use any violence towards him except in self-defense. She admits that she struck him on two occasions. On the first one they had gone to town together, and separated there for a short time. There appears to have been a misunderstanding in regard to the place of meeting, and she states that when they met and started for home he commenced to swear at her; that he swore all the way down the street, and until they were nearly a mile out of town, and waved his fist; that

he swore until she was nearly frantic, and she told him to stop or get out of the buggy, or she would hit him; that she struck him on the nose with her fist, and he stopped swearing. The next act of violence on her part, she says, was committed the morning after she was thrown out of the house, and she describes it as follows: "The other time was Sunday morning. He ordered me out to herd the cattle while he husked corn. I told him I had planned to go to church, and he told me that I should not dare to take my horse out of the barn. I owned a horse and buggy and harness. I bought them after I married him, with my own money. I did what most any woman with a little grit would do. I tied the horse to a post, and he came out there, and said he was going to take her in the corn field. I told him I guessed not. He said I should not have the harness. I told the little boy to get it. He went to the buggy, and got the harness, and then there was a tug of war. My husband tried to pull it away from me. Frankie ran up the road. So he dropped the harness, and ran after him. He brought the boy back. This time I had the harness. He told me to give it up. I had the buggy whip. I told him I would hit him if he did not give up, and I struck him one lash. I don't know,—one or more. I know I did not hurt him much. He gave up the harness.   *   *   * I gave him to understand I did not intend to live with him. He said he would do what was right if I would do what was right. I told him I did not think he knew what was right." The plaintiff testified, on cross-examination, that she did not think her life was in danger when she struck her husband with the whip; that she "was in fun." In describing her conduct, she states: "I was just as independent as one could be; just as independent as I knew how to be. I don't know but what I am always independent. I meant when I said I was always independent that I am of an independent nature." She was asked in regard to her having been put out of the house in her nightclothes,

and said that her husband did not shut the door on her, but did not coax her to return to the house until she asked him what he was going to do with her,—whether he was going to send her away, or let her go into the house. In response to the question, "You were out there, and you gave him to understand that he must put the bedclothes back, and all those little things you required of him; if he did not do that you would stay out. Did he go and do those things you required of him?"—she answered, "He took the bedclothes in, and I walked into the house; I slept in the bed I first intended to sleep in." In response to another question, she states: "I did not say I treated him lovingly the first week I lived with him. I think sometimes I did not treat him as lovingly as a wife ought to." The account given by the defendant of the note incident is that when he asked her to sign the note she became very much excited and talked at least twenty minutes, using abusive language towards him; that he asked her if she had run down; that he threw the note he had drawn into the stove; and that within five or ten minutes thereafter she said she would sign a note, and he drew another. He says, in regard to the chicken incident, that just before he threw the chicken his wife was very angry, and threw the butcher knife at him, and that she threw water at him; that he did not throw a knife at her or near her, but into a corner of the room. He explains the incident in which the buggy whip was used by saying that he needed the horse she was intending to drive in place of another which was sick, and that "she went out and sat in the buggy, and did everything she could to tantalize me." He also says she struck him several times with the whip. He says, in regard to putting her out of the house in the nighttime, that she dared him to do it; that within five minutes after she was put out he pleaded with her to return, but she refused; that she finally said she would go back if he would put the bedclothes back, and he did so; that, as he was picking them

up, he heard the niece of the plaintiff say to her, "Now you have got him," and the plaintiff answered, "I am sure I have." He denies choking her, but states that on one occasion his wife struck him with a broomstick, and he put his hand "on her epiglottis, and pushed her back far enough so I could take the broom out of her hand. She did not breathe hard." But little of his testimony is contradicted. Our conclusion, reached after a careful examination. of the entire record, important parts of which we have not set out, is that the life of the plaintiff has not at any time been endangered by the treatment of the defendant: That he has been guilty of unmanly, and even brutal, conduct is true. But in many of their. difficulties her conduct was as blamable as was his, and in some instances she provoked trouble without cause. Both were in fault, neither exercised the forbearance nor manifested the consideration for the rights and desires of the other which their relation demanded, and, although the husband's conduct is without justification, we are not prepared to say that it was more reprehensible than was that of the wife. That the union in marriage of two persons having such dispositions is unfortunate is probably true, but incompatibility of temperament is not a ground for divorce in this state. Our conclusions have support in the following authorities: *Blair v. Blair,* 106 Iowa, 269; *Schaffer v. Schaffer,* 106 Iowa, 492; *Potter v. Potter,* 75 Iowa, 211; *Maben v. Maben,* 72 Iowa, 658; *Whaley v. Whaley,* 68 Iowa, 647. The plaintiff is thirty-one, and the defendant is thirty-five years of age. Both have taught school, and appear to be intelligent people, and the plaintiff has, as she says, "a pretty good constitution." No sufficient reason for their permanent separation is shown, and the decree of the district court must be and is REVERSED.