BERTHA CHAPMAN, Appellee, v. FRED CHAPMAN, Appellant.

**DIVORCE:** Grounds—Prior Unsuccessful Action—Effect. A second
1 action for divorce by the same party for the same cause, following the dismissal, *on the merits*, of a former action, must be determined on the evidence of acts occurring subsequent to the decree of dismissal.

**DIVORCE:** Grounds—Cruelty—Profane and Abusive Language.
2 Profane and abusive language addressed to complainant by the defendant in a divorce action, is material, though *in and of itself* insufficient on which to base a decree.

**DIVORCE:** Grounds—Cruelty—Abusive Language—Evidence—Suf-
3 ficiency. Evidence relating to charges of want of chastity, physical encounters between husband and wife, and much in the way of mutually coarse, profane, and abusive language between them—both of apparently equal coarseness of nature—reviewed, and held insufficient to justify a decree of divorce.

**WITNESSES:** Credibility—Vouching for Credibility of Witness.
4 It does not lie in the mouth of a party to insist that his own witness is an artistic falsifier.

**DIVORCE:** Evidence—Corroboration—Rule to Determine. No ex-
5 act standard exists for the measurement of required corroboration in divorce proceedings. But it must be sufficient in quan-

tity and nature to lead an impartial and reasonable mind to believe that the applicant's *material* testimony is true. Slight corroboration on a vitally material point may be sufficient. Large corroboration on a comparatively immaterial point may be wholly insufficient. Corroboration on *one* alleged transaction or fact does not necessarily work corroboration of *all* other alleged transactions or facts.

DIVORCE: Pleading—Failure of Proof. An allegation "that plaintiff has conducted herself at all times since her marriage as a dutiful and faithful wife," followed by an affirmative showing that such allegation is untrue, reveals a *fatal* failure of proof on a material allegation.

*Appeal from Monona District Court.*—W. G. SEARS, Judge.

NOVEMBER 21, 1917.

PLAINTIFF was granted a divorce on the charge of cruel and inhuman treatment. Defendant appeals.—*Reversed.*

*Oliver & Allen,* for appellant.

*J. A. Prichard,* for appellee.

SALINGER, J.—I. Earlier than this suit plaintiff sought a divorce on the charge of cruel and inhuman treatment. The present petition alleged that, in the first suit, she claimed "that, by reason of the aforesaid ill treatment," she believed she could no longer live with defendant without endangering her life, and alleged that she therefore left bed and board and brought said earlier suit; and that the same resulted in a dismissal of her petition on the 16th day of May, 1914. In this suit she, in effect, sets up the same charge of cruelty that was made in the earlier suit. It is added that she returned to her husband after said dismissal with the intention of making it her home, and that, shortly after this return, defendant did again such acts as the petition in the first suit complained of.

1. DIVORCE: grounds: prior unsuccessful action: effect.

For some purpose, plaintiff offered in this trial the cross-petition in the first trial. But that pleading itself is not in the abstract, and we know nothing concerning its offer, except that the offer was made, and ruling, upon objection to it, reserved.

Both by motion to strike and by plea of estoppel in bar, defendant in effect asserts that plaintiff may not obtain a divorce upon any "cause of action for divorce on the ground of cruel and inhuman treatment" that may have existed prior to May 16, 1914.

The answer, in addition to this plea of estoppel, is, in effect, a general denial, which emphasized especially its denial of having done any of the acts charged subsequent to said dismissal. It avers affirmatively that plaintiff is coarse and profane in language and expression, hasty in action, and a person of violent and ungovernable temper.

Many of the questions put to plaintiff were broad enough to cover time both before and after the dismissal of the first suit. To all of them, the objection was interposed that the decree of dismissal in the first suit made answers inadmissible. On whether the testimony so received may have consideration, appellee concedes that, if plaintiff "had been relying entirely upon evidence which could have been used or was used in the former trial, then the plea of former adjudication would be good." The attempted avoidance of the concession is the statement that all the actions of both parties during all their married life would be competent evidence "to enlighten the court as to the condition of affairs between them." It is further said that evidence was introduced in the first trial which, if false, was a fraud upon the court; that its tendency was to prove plaintiff to be an immoral character; and that this would cause her great mental suffering, which would continue "until this was disproved." Followed to its logical end, this claim means that if, on the first trial, the defendant had falsely

sworn that plaintiff was guilty of a specified immorality, and the court had thereupon found against the plaintiff, or if he had falsely denied a specific charge to which the plaintiff addressed testimony, this leaves her at liberty in this trial to introduce the false accusation of the husband and the true accusations made by the wife in the first suit—first, for the purpose of showing that a fraud was committed upon the court in the first trial, consisting of said false swearing, and, second, to enlighten it "as to the condition of affairs between them." In the last analysis, this is a claim that, if the prevailing party testify falsely on any matters settled by decree, the defeated party is at liberty to sue again, and to proceed as though the decree had not settled said matters. We cannot, of course, so hold, and this appeal must be determined upon the state of the evidence in support of the allegations in the petition which charge misconduct subsequent to the time at which said first decree was entered.

No condonement is pleaded, that the defense is not in in the case, and we should not confuse estoppel by adjudication with condonement. To be sure, a repetition of offense will avoid condonement and may sustain a decree. But that does not in the least meet the point that, where one makes specific charges and puts in testimony in their support as the basis for seeking a decree of divorce, and is defeated, he may not obtain a divorce by suing over and asserting and proving the same charges. *Lewis v. Lewis,* 75 Iowa 200, is not to the contrary, because there was a voluntary dismissal because of an agreement on part of defendant to abstain from the drunkenness for which divorce was sought; and all that is held is that, on repeating this offense, its condonation was not available. On the other hand, that one who seeks divorce because beaten on a stated day, is denied a decree, will not bar her from asserting a

beating later than the entry of such decree. In other words, while it will not help her to re-prove what the decree against her held did not entitle her to a divorce, this will not relieve us from determining whether plaintiff has proven that, since her return to him, defendant abused her, swore at her, cursed her, called her indecent names, accused her of unchastity and of having sexual intercourse with other men, beat and bruised her person until her life was in danger, and she was again compelled to leave his home for fear of her life, and that she can no longer live with him as his wife, without danger to health and life.

2. DIVORCE: grounds: cruelty: profane and abusive language.

II. While in strictness the petition is not grounded upon the fact that defendant was profane and addressed plaintiff abusively, and while proof that he was profane and so addressed her will not of itself justify decree for plaintiff (*Peabody v. Peabody,* [Mich.] 149 N. W. 975), evidence on these points has materiality. Plaintiff says that, when she asked him to harness a team, he would do it, but would say, "Pretty soon the boys will be gone and then, God damn you, you will not even get a horse to go anywhere;" that one who he thought was going to testify for her, he called all the names "one could think of," and said, "God damn you, you can have him if you want him"—no intimation of unchastity being made. She testifies that he said, "God damn, if I knew that, I never would have took you back," and "All right, by God, you are not the only woman;" but admits that this was said at a time when she advised the husband that she had been informed by her lawyer that she was under no obligation to live with him as his wife; that she would not do so; and that doing some of the housework was all the duty she owed; and probably after she had told him she no longer loved him. Their son Lee testifies that, while he has heard his father swear, it was not at his mother.

### 2-a

If human testimony is of any value,

3. DIVORCE: grounds: cruelty: abusive language: evidence: sufficiency.

including that of Gray and Mrs. Bishop, witnesses for plaintiff, she was rather easy to anger, and when angered, addressed the worst imaginable profanities and epithets to her husband. Her own testimony is a confirmation. It had been told over and again that "son of a bitch" was one of her frequent remarks. Knowing this, she testified as follows:

"I do not remember that I swore at the children. Q. Did you call him a son of a bitch? A. Not that I know of. Q. Did you ever swear at the boy? A. Not that I remember of. Q. You never called Fred any names, did you? A. Not that I remember of."

In cases where it was sworn that she used vile profanity and also personal violence, she responds by a denial of the violence only, which at times is no more than that she does not remember the charged violence.

### 2-b

She testifies that, after she returned, he was guilty of the rather vague offense of "throwing it up" to her; that "he kept calling up men to her;" but that she does not know whether he meant she was intimate with them or not; that he said he knew she was meeting men in Omaha right along; that he knew Webb had been intimate with her in Hot Springs; that she was getting fleshy since she was at Hot Springs, and he thought there was something wrong and that it belonged to Webb—accused her of being in the family way "with some other man besides himself." This the defendant fully and explicitly denies. She says that one Sunday morning the youngest boy was fixing a cart and was getting ready to take a ride, and she said, jokingly, "Aren't you going to take me a ride?" that the boy replied.

"No, by God, call Cal Webb to take you for a ride;" that his father was there in the house, and she said to the father that she was going to whip the boy for that, and the defendant answered, "By God, you will not." This is also denied. The boy testifies that he did taunt her about Webb; that he doesn't know how he happened to do it; and that he has heard her taunting his father about her flirtation with Webb. We find no denial of this taunt.

### 2-c

Plaintiff says that, at one time when they were talking, she said something and he got mad, and, in the presence of the son, Lee, chased her all around the house, and knocked her down and got on her with his knees; that she became so sore she could hardly turn over in bed that night. This boy says that, at the time in question, the father did not offer to hurt her. Defendant says he never struck her in his life. She claims she was in said condition the next day, and on that day visited the Sorensons. The Sorensons were witnesses, and no attempt was made to corroborate this claim through them.

III. The main incident relied on is what occurred on the night on which she left. It must suffice that the most essential only be here detailed. Her account is that, on her return early in the evening of that night, her husband insisted she had been away "to see about this law suit," and she denied it, and said she had done nothing crooked; that he responded, "Yes, by God, what did you do at Hot Springs?" which, it seems, implied an accusation of unchastity. She replied she thought he was through with that, but he repeated the offensive remark. At this point, her testimony becomes rather self-contradictory. First, she says that, on the repetition, she grabbed a dish and "let him have it;" that thereupon he threw up his arm, and the dish went

to the floor; that she don't think he was struck, and, if a piece of the dish cut through the plaster, she didn't see it; and when she threw, her husband grabbed her and threw her on the floor; that, in so doing, he struck her arm against a door, and after she was down, he got one knee on her chest and held her neck down. Yet she says, also, that she was naturally provoked, and did not throw the dish in good humor; that she does not remember whether she "grabbed anything off the table;" and that she didn't have time to throw anything before her husband made said assault—forgetting the other statement that the assault came after the throw.

Gray, her witness, gives this account: On her arrival, the husband was in good humor; nothing was said about her relations with other men. There was some inquiry as to where she had been, and she spoke up and said to defendant that his father and mother were crooks; that the whole bunch was; to which he answered, "If anybody is a crook, you are as much a one as I am," and she replied, "The records at the courthouse show you were trying to hire a man and woman at Hot Springs to swear against me." He said he didn't, and she answered, "You say that again and I will fire a dish at you;" that the husband answered, "That is what I said;" and that he had not been trying to get evidence against her. She retorted he had, and if he said he hadn't, she would throw a dish at him; that he repeated he hadn't, and she "slammed" or "fired" the dish at defendant—a heavy, big porcelain dish filled with potatoes, and about ten inches across the top. She acted pretty mad at the time. When she threw it, defendant was sitting on the corner of the table, which was not very wide, and she was standing by another corner of the table; that defendant threw up his elbow; that, after striking the elbow, the dish struck the wall, which had two coats of plaster, a hard finish and an under one, and broke into

pieces no bigger than an inch square, on going "plumb" through the hard finish into the soft plaster.

Defendant says it made a cut in the wall about four inches long and probably a half an inch deep, and he would have been hit square in the face had he not diverted it by his throwing out his elbow. Gray says that she reached to grab another dish, a small kind of a cut glass sauce dish, and said, "You just hit me," and defendant answered, "That is what I ought to do;" that then defendant jumped and grabbed her by the arm and got her on the floor, and while there, she gave defendant a good deal the worst of it; that she mashed him in the mouth or in the teeth while he was laying her down, and made his teeth bleed "all along," and defendant let loose of her and she got away; that he did not have his knees on her body, and did not choke her; and witness was in position where he must have seen it, had this been done. This is, in substance, the version of defendant. Gray adds that, when she got up, she said, "You son of a bitch," and walked into the other room, and ran to the phone and began to call for the sheriff, saying Fred had gone wild and was crazy and everything else, and that she would not live with him any more.

A witness says plaintiff didn't cry a bit, except that, when she called the sheriff, "she was trying to make out a cry." Plaintiff testifies that, when she got up from the floor, she called the sheriff on the phone, and he advised her to leave, and she did so with one Ross, whom the sheriff sent. The sheriff says plaintiff called him up, and he judged by her voice over the phone that she was then crying; that she said they were having trouble down there, and wanted him to come for her, and he sent Ross, a liveryman, to get her. Ross says, when asked whether Mrs. Chapman was crying when he arrived, "Well, sir, you have got me; I didn't pay much attention to it."

It has been pointed out in another place what the evidence is on her being profane, abusive, high-tempered, quarrelsome, and given to physical violence. In addition, there should be noted what is more fully gone into in another connection; i. e., that the evidence shows she came back without love, without forgiving, planning for a second divorce suit, disclosing this state of mind to the husband—among other things telling him that her attorney advised her not to cohabit, and that she would not, and that she did not.

### 3-a

If plaintiff be not adequately corroborated, all she testifies to may not be considered at all. If she be adequately corroborated, it accomplishes no more than that all her testimony must be considered in determining whether she has sustained the allegations of her petition by a preponderance of the evidence. We shall have occasion to consider to what extent she is corroborated, but for present purposes will assume that she has been. This brings on an application of the law to what she says and to the counter evidence.

In *Olson v. Olson,* 130 Iowa 353, the use of indecent, violent, threatening language and of threats "to fix" the wife are held insufficient. In *Shors v. Shors,* 133 Iowa 22, while a decree of separate maintenance is not sustainable upon personal violence and threats alone, it is clear there were long continued, wholesale charges of adultery, which included a denial of the fathership of the daughter; and there was proof that the husband abused the child because of this. In *Ellithorpe v. Ellithorpe,* (Iowa) 100 N. W. 328 (not officially reported), there is some language which, carelessly read, gives too much weight to accusations of unchastity. What is really held is that, where the record shows the use of vulgar and profane language, threats to induce other women to enter into concubinage with the

husband, and insistence that the wife consent, frequent application of opprobrious epithets implying want of chastity, a general fault-finding disposition, and that the wife broke down with nervous prostration, repeating the charge of immorality in evidence on the hearing is a breach of the condition underlying an alleged condonement.

In *Peabody v. Peabody,* (Mich.) 149 N. W. 975, it was a factor against divorce that, when the husband tried to induce plaintiff to return, her mother informed him he could not come in, and ordered and pushed him off the premises; and that the violence of the husband was done when he was under stress. In *Knight v. Knight,* 31 Iowa 451, at 454, there had been an estrangement and plaintiff took counsel with reference to the procuring of a divorce, but this difficulty was adjusted, and they went to living together again, plaintiff still refusing, however, to occupy a bed with the defendant. There is evidence of greater violence on part of the husband than appears here, and it, too, is denied. We say the record shows further that plaintiff seemed to possess a temper readily aroused, a will which never yields, and a caustic wit ever furnishing a keen retort which she made no effort to restrain, and defendant's make-up appeared not to be best adapted to these peculiarities of the plaintiff. We hold one reason why plaintiff is not entitled to divorce is that her own conduct brought upon her all the ill treatment of which she complains, and that there is no doubt that, if she had justly appreciated the responsibilities and duties of her position, had properly regarded the failings of her husband and restrained her pride and guarded her temper, she might have remained an honored and cherished wife. As in the *Olson* case, 130 Iowa 353, 355, we say that there was much to palliate what the husband did and to excuse him, and that the cure is not the divorce court, but improvement on the part of both. In

*Owen v. Owen,* 90 Iowa 365, we held that, where a woman of 27 married a man of the same age, one is inconsiderate and provoking, and the other irritable, and some violence provoked by her conduct is used, and once, in self-defense, he pushed her down, bruising her cheek, neither is entitled to a divorce.

*Layton v. Layton,* 166 Iowa 74, is in some aspects quite like the instant case. There, there was an act of physical violence committed while defendant was punishing the oldest girl, and the wife interfered. There is some testimony tending to show that there was a physical encounter, and that, during the melee, defendant threw plaintiff to the ground; but we point out that there is no evidence the husband used any more force than was necessary to cause her to desist from taking the cans from his buggy, and that, while her arms were somewhat bruised and blackened in the contest, her life was at no time seriously in danger. In *Blair v. Blair,* 106 Iowa 269, there were frequent quarrels, for which both were at fault. The wife, though kind at times, was of a hasty and violent temper, which caused her to use profane and abusive language towards her husband, and threaten and attempt bodily injury on him. At various times she took an ax and threatened to break his head. She threw a pan of lye water in his face, injuring his eyes, threatened to let his brains out with a smoothing iron, threw the lid of a butter dish at him, jumped for the butcher knife and threatened to cut his liver out, used abusive language, threatened to open his head with a chair, struck him with a buggy whip. He frequently came home under the influence of liquor, but only twice drunk. He did not use vulgar or profane language. When he had been drinking, he was arrogant and boastful of his wealth, and was at times coarse in his language, and provoking in his manner towards his wife. He spoke in coarse terms of

her physical condition to his brother-in-law, secured a statement of a boy in his employ that she had hugged and kissed him, and endeavored to induce this boy to be caught in an act of illicit intercourse with her.  He made public on the trial her immoral conduct before marriage, which he had forgiven.   On occasions, he insinuated that she was too free with other men, and he used threats and violent language, but never attempted bodily harm, and the wife had no reason to fear personal violence.  She was a strong and hearty woman, in as good health as when she married, and we reversed a degree granting her a divorce on account of the husband's treatment of her.  In *Sylvester v. Sylvester*, 109 Iowa 401, decree for plaintiff is reversed.  The acts of cruelty testified to by the wife are, on the whole, more aggravated than the ones claimed here, and the testimony of danger to health much more strong.  There are similarities, in that assaults are admitted and counter assaults are proven.  It would extend this opinion unduly to set out the details of the *Sylvester* record, but what we have said sufficiently notes it in its bearings upon this case. It must suffice to say that, if a divorce was not due in the *Sylvester* case, it is too clear for argument that this is so here.

### 3-b

Plaintiff testifies that, when she returned to her husband, she "was fairly well in health," though she was not in very good condition "to stand things he would throw up and say."  She excludes "watching and spying" by saying she does not think her husband was watching her or spying on her after she returned, and this was when she lived with him before her first divorce suit, and that she paid no attention to his watching her.  She adds he had her awfully nervous and stirred up, but "sure" she talked back to him, though he had it over her in a war of words; that

she is in a very nervous condition, and thinks "in a worse condition when living with him." She concludes that his accusations "and this trouble" didn't have a very good effect on her health, that at times her health was broken, and "I don't think I could live with him without endangering my life. I was positively afraid of him."

In *Olson v. Olson*, 130 Iowa 353, there was evidence of the use of indecent, violent and threatening language, and of threats to fix the wife. We hold that, under all the circumstances, these did not rise to sufficient dignity to be a menace to plaintiff's life or health, and that this is so though there be testimony that at one time defendant called her a damned liar. It is pointed out in *Knight v. Knight*, 31 Iowa 451, at 457, that plaintiff does not testify the blows were inflicted with force, or that they occasioned any personal injury, and it is quite probable they were attended with no other consequences than wounded feelings; and that, where what is complained of is brought on by the indomitable will of the wife and her ever readiness to resent the slightest approachment upon the domain of her rights, there is no reason to apprehend physical danger in further continuance of cohabitation if the wife will abandon this course on her part. In *Wells v. Wells*, 116 Iowa 59, at 60, both petitions were dismissed. We find that plaintiff's conduct towards his wife was by no means such as it should have been; that he did unquestionably at times mistreat her, but that there is substantially no evidence of permanent impairment of health; and that none of these cases of physical violence complained of were calculated to endanger life.

*Leonard v. Leonard*, 174 Iowa 734, is not available here, because it presents a case of such unjustified assaults by a large, powerful man upon a small and seriously ill woman, and such other mistreatment as that, in the very nature of things, it may not be doubted that continuing to submit to it would make it unsafe to the life and health of the woman.

The evidence fails to show "such inhuman treatment as to endanger the life" of the plaintiff.

IV. We have indicated that, if every material thing testified to by plaintiff had corroboration, that still the weight of the evidence is against the petition rather than a preponderance sustaining it. But is there such corroboration? It may be admitted that what occurred at one time when plaintiff was angered because a young dog had torn slippers she had left on the porch, is some evidence that defendant did swear at plaintiff, and call her a vile name. What occurred is disputed, but we will assume it has said tendency. But it is clear that all that effects is to shore up the claim that he was guilty of like conduct on the other occasions upon which he is charged with the same. Now, though that be so, positive testimony by disinterested witnesses, and of a witness called by plaintiff, certainly as much tends ·to show that on said occasions he did not indulge in such conduct. In other words, evidence showing a disposition to do a certain thing cannot stand against positive evidence that it was not done. The method by which appellee seeks to break the force of this situation is not a permissible one. First, she charges that defendant has tried to, probably has, alienated the affection of the boy Lee. We find no evidence to sustain this claim, unless· it be that the testimony given by the boy is naturally not satisfactory to appellee. Of a witness called by the plaintiff, her counsel tells us that, if this court "could have seen this young man on the stand and heard his testimony, it would believe, as did the lower court, that his testimony was absolutely unworthy of belief," and further, "the evidence of this witness certainly needs no contradiction to prove its falsity." Of the same witness, and one called by defendant, we are told that they "were schooled to give

<div style="margin-left:0">

4. WITNESSES: credibility: vouching for credibility of witness.

</div>

their testimony, and its very nature and the kind of testimony it was, and the manner in which it was given, negatived its truth. It was false and inspired alone by the defendant." Also, that, if defendant was capable of forgery, it would be a small thing for him to suborn witnesses, "and he did this in both trials." We have to say that, self-evidently, it cannot avail the plaintiff to urge that her own witness is unworthy of belief, and was suborned to and did perjure himself. It should be added there is no evidence that anyone was suborned, and all the testimony touching this is that of the witness whom plaintiff called, and who says nothing except that defendant never asked him to tell anything but the truth.

We are not unmindful there is a line

5. DIVORCE: evidence: corroboration: rule to determine.

of cases which, rightly seeking to escape the requiring of literal corroboration on every charge made and incident disclosed, attempt to hold that corroborating one act may be of such nature as to make it likely that other acts charged and not corroborated have been committed, and that, so, corroborating one corroborates all. We are in no doubt that, if a murderous and unjustified and unprovoked assault. were fully established, it would tend to corroborate the claim that there were other assaults of like nature, but, manifestly, we should not go so far as to say that corroborating *anything* testified to will, of itself, furnish corroboration as to all. We think that this is not the law. What is the law is made clear by a fair consideration of the authorities as a whole. There need not be express corroboration of every item of evidence introduced to establish the fact contended for. It is sufficient if it tends in a general way in that direction. It is not required that the corroborating evidence shall be of itself strong enough to prove that charge. It need but tend in some degree to establish the

fact sought to be proved.   *Clark v. Clark,* (Minn.) 90 N. W.
390.   Even if the direct corroboration as to acts entitling
to divorce is slight, it may become sufficiently strong by
proof of acts that are in harmony with and indicate a dis-
position to commit said acts otherwise insufficiently cor-
roborated.   *Tuttle v. Tuttle,* (N. D.) 131 N. W. 460.

In *Andrews v. Andrews,* (Cal.) 52 Pac. 298, the rule
was laid down that, where the cruelty consists of successive
acts of ill treatment, it is not necessary that there should be
direct testimony of other witnesses to every act sworn to
by the plaintiff.   It is sufficient corroboration if a consid-
erable number of *important* and *material* facts are so testi-
fied to by other witnesses, or there is other evidence, cir-
cumstantial or direct, which strongly tends to strengthen
and confirm the statements of the plaintiff.   In *Peabody v.
Peabody,* (Mich.) 149 N. W. 975, stress is laid upon the fact
that, while witnesses corroborate the testimony of plain-
tiff "in some of its phases," it is not done as to any of the
more serious charges.   In *Olson v. Olson,* 130 Iowa 353, the
husband and wife conflicted, and we lay stress upon the fact
that there was no corroboration of "his use of violent names
on two occasions."   While we do say, in *Leonard v. Leon-
ard,* 174 Iowa 734, that it is not essential that the tes-
timony of plaintiff be corroborated at every point, or that
it touch every element or ingredient of the marital offense
alleged, and say it was held in *Clopton v. Clopton,* (N. D.)
91 N. W. 46, that, where the whole case precludes the pos-
sibility of collusion, the corroboration need be very slight,
that is addressed, and rightly so, to the facts of that case.

4-a

Now as to the claim that there were false accusations of
unchastity, the record is this: George Sorenson remembers
a talk he had with defendant some time after the trial of

the former suit, and thinks defendant spoke about her keeping company with men while she was at Hot Springs, but doesn't remember just what he said.  Being then asked to tell the best he could as he remembered it, he said he didn't believe he could do that, but thinks defendant said she was "kind a flirting" with other men in Hot Springs; that he did not accuse her of having intercourse with any of these men, though he thinks the defendant said he was told she kept company with men at Hot Springs and in Sioux City.  Mrs. Sorenson says that, after she left the second time, defendant said plaintiff had been intimate with other men, but she never told plaintiff of this.  Again, she says that she visited with plaintiff in town at Mrs. Bishop's, and doesn't remember whether she told plaintiff what defendant told her, but believes she did.  Again, she testifies the defendant said she was with a man in Hot Springs, but she adds she did not understand him to mean she was acting the role of a prostitute or anything of that kind; that he had never said anything to her from which she understood he was trying to charge his wife with having sexual intercourse with other men; that she never heard him accuse her of being bad with Webb; that he did not charge her with being unchaste, but that she was running around with other men, and the witness didn't know what he meant by it.

### 4-b

All that remains is the testimony of Mrs. Sorenson, who says she personally has never known of any unkind treatment of plaintiff by defendant, and that, from all she could see, defendant appeared to be good to her, but who testifies also that, "in August," plaintiff showed witness her arm where she was hurt, and told her defendant had hurt her, and that there was a kind of a little mark, witness not knowing how bad the arm was hurt.  Give this its utmost

weight, and it shows that, soon after plaintiff left, she had some sort of a bruise on her arm. That only corroborates what no one denies, namely: That on the night upon which plaintiff left, that occurred which might easily cause some sort of a mark on her arm. It certainly cannot overcome the great weight of evidence which shows that any injury sustained by plaintiff on that night was due to her own violence, and done upon her in self-defense.

The cases just analyzed, as well as *Knight v. Knight,* 31 Iowa 451, at 457, and *Olson's* case, 130 Iowa 353, at 354, indicate quite clearly that the statute is not yet repealed, and that corroboration, therefore, means something which leads an impartial and reasonable mind to believe that the material testimony of the plaintiff is true.

V. Aside from all this, it was error to grant plaintiff the relief prayed by her.

6. DIVORCE: pleading: failure of proof.

Plaintiff alleges:

"That during the time they lived together as husband and wife (all the time since they were married), she has conducted herself toward the defendant as a dutiful and faithful wife."

She should so allege, because, seeking affirmative relief in equity, she should do equity, and because, possibly, that unless this allegation is true, she should have no relief in equity, because she has failed in her part of that contract which the law implies. But what of the proof? True, she testifies she returned in good faith, intending to make that her home and to get along with her husband, if it were possible, and determined to do her duty as a wife. But does not her own testimony show that she neither intended nor did this? We find it difficult to believe that any impartial mind can read this record and reach the conclusion that she made, or even thought of making, such an attempt. It is forced upon us that she returned to retrieve a lost

cause, and to institute a second divorce suit which should be successful; and are constrained to conclude that, instead of proving said allegation of the petition, every act from the time she returned until she again left, colors the purpose of that return, negatives her being a dutiful and faithful wife, and demonstrates that she who is seeking the aid of equity does not by her conduct appeal to the chancellor.

The husband acted promptly in asking her to return. She desired two weeks to deliberate in, and was given that time, and took it before concluding to return. In asking her, the husband stated they had three children that ought to have a father and a mother. She answered she could not always be with the children anyway. She admits she told him repeatedly she wished she had not come back. Her entire stay was from about the end of May to the end of August. She admits that her affection for her husband waned, and the matrimonial yoke was galling as early as some eight or nine years ago, when she was sick. She confesses she did not love him at and before the time when she started her first divorce suit; that she never could love him after that first suit, and did not love him when she returned to him; and that she would not get a divorce if she "cared a cent for him." She does not deny a statement of her husband's that he asked her at one time why she returned, and she said the damn judge gave her the worst of it, and she had to come home or get nothing. Being asked whether she ever forgave her husband for the wrongs she thought he had done her before the close of the first trial, she answers:

"There was a whole lot of things I never could forget, and I don't know if he asked me to. I don't remember whether I ever forgave him or not."

The husband testifies that, when they were returning home, he said to her, "If you are going to stay, don't ever

mention this to me, and I will never say a word to you;" and that she replied, "No, I will be damned if I will do it," which fairly harmonizes with her statements on forgiving him, and is testimony which she has not chosen to deny. She made search for and found some envelopes and unsigned letters, which she says have writing done by her husband. Assume she did no wrong in searching for what would get her a divorce; but things that were used in the first trial would not get her a divorce. By way of illustration, Exhibit "J" found by her was put in on the first trial as Exhibits "B" and "C." Here is the wife, intending a good-faith reconciliation, confessing that she and her attorney went to the courthouse to make comparisons to help the effectiveness of this discovered evidence, consisting of what she was unable to get a divorce upon—confessing that she knew the effect of what she was seeking for and keeping as evidence, and that she "guesses anybody would know it." This conduct can mean nothing but her return in a spirit of bitterness, unforgivingly, and with a desire and purpose that a then contemplated second suit for divorce should be victorious. Speaking to these very letters, she testifies that, when she returned, she had these letters still in mind, and that the trial judge who defeated her had said that she failed to get a divorce because she had not shown these letters to be forgeries. She says, despite all this, that she did not expect more litigation. But, as seen, she not only admits the search and the comparisons at the courthouse, but testifies that, on the very night of her return, she thought that, if her husband "kept acting up like that, there might be some time." She carried this spirit into other things. She did not want defendant's father on the place because he had been a witness against her in the unsuccessful suit. She called his mother and his people "crooks" for the same reason, and opposed the children's

seeing the near relatives of the father. The Arensons were to be tabooed because they had testified against her.

Still other things throw light on whether she came back to be a loyal and helpful wife, or as a planner who hoped to wage a more successful war from the home of the enemy. The husband testifies that plaintiff kept going to town, and sometimes it would be eleven at night before she got home. This is not denied. He continues that, on one of these occasions, when she returned, she told him that, if he didn't settle with her, she was going to break him, because she had been up and talked with her attorney; that he asked her why she didn't take the $3,000 he offered, to which she replied her attorney told her not to take it; that she would get more money. The denial is that she never told him that she and her attorney calculated to strip him of his property—which does not quite meet what it is attempted to meet with it, and something, too, which loses force by the fact that she was more or less constantly in touch with her attorney after she had returned, though it would seem that, if she were back in good faith, that relationship would, at least for a reasonable time, have been suspended.

Nor is this the most persuasive impeachment of her good faith and refutation of her claim that she was a faithful and dutiful wife. The youngest boy says he heard her say to the husband that her attorney told her she didn't have to work. The husband testifies she informed him her lawyer told her she didn't have to do his washing, and she wouldn't do it; so he did his own washing on Sunday, washing the dirty clothes that day and sending the lightest ones to the laundry. She testifies she told him she would wash for the family, but not for him, and that her attorney had advised her that she was under no obligation to work for him or bake the bread. She forgets she has done this, and in rebuttal testifies the attorney did not tell her

she was not obliged to do her husband's washing, and that she never told her husband she had been so advised, and that she did her duties as housewife again, "like I always did." The son says she washed and cooked for him, and the father cooked him a few meals sometimes.

Nor is this all, or the clearest. She says that, because her husband had disgraced her in the first trial, by charging her with being intimate with other men, she would not live and cohabit with him as his wife. She states that her attorney advised her to return and live with him, and that maybe the old affection would come back, but that the law did not oblige her to live with the husband as his wife unless she felt like it; that she herself didn't think she was under obligation to do this; that she intended doing the work, but was not going to be a wife to defendant; that she told him, a day or so after her return, that she did not propose to cohabit with him; and that her attorney said she did not have to submit to him, and was under no obligation to again sustain the intimate relations of a wife. She told him, shortly before she left him, that she did not love him. She says frankly she considered the doing of the work she did do as fulfilling all her obligations; that this is all she did to revive the affections of the husband; and that she thought that this was all that was necessary. In the face of all this, she testifies that she did not tell Mrs. Sorenson she (plaintiff) did not intend to live with defendant, but merely said she did not intend to do so if he kept on acting the way he did. And yet it was confessedly her intention, upon advice of counsel, not to live with him no matter how he acted, because the intent was fully formed on the very instant of her return. And she goes so far as to swear she never told her husband that her attorney had advised her she did not have to live with the husband as his wife. And she makes an attempt to have it appear

that this advice was given upon a second consultation, or that, at least, it was then confirmed, and was due to her bringing one of the papers she had found to her lawyer—in doing which she overlooks that the advice as to her duty upon her return was given to and followed by her before she submitted these papers to her counselor.

It is our judgment that the decree below is not sustained by the evidence, and that it must for that reason be —*Reversed.*

Gaynor, C. J., Ladd and Evans, JJ., concur.