STELLA WINIFRED HOLMES, Appellee, v. FRANK A. HOLMES, Appellant.

DIVORCE: Cruelty—Communication of Venereal Disease to Wife.
1   A husband's act in *knowingly communicating* to his wife a venereal disease constitutes cruel and inhuman treatment, within the divorce statute.

DIVORCE: Cruelty—Communication of Venereal Disease—Sufficiency of Evidence. Evidence reviewed, and held sufficient to
2   establish charge that husband had knowingly communicated to his wife a venereal disease.

DIVORCE:  Jurisdiction—Residence of Parties.  The district court
3  of the county in which the wife is *living*, and to which she has
  removed with the intention to permanently remain there, has
  jurisdiction, under Section 3171, Code, 1897, of suit brought by
  her for divorce.

*Appeal from Fayette District Court.*—ALFRED N. HOBSON,
Judge.

FEBRUARY 18, 1919.

REHEARING DENIED MAY 21, 1919.

ACTION for divorce on the grounds of cruel and inhuman treatment.  Decree for the plaintiff in the court below.  Defendant appeals.—*Affirmed.*

*Ainsworth & Antes, E. R. O'Brien, W. W. Wooley,* and *Bailie & Edson,* for appellant.

*E. H. Estey, W. B. Ingersoll,* and *I. W. Bane,* for appellee.

GAYNOR, J.—I.  Plaintiff and defendant were married in the city of Oelwein in this state, on the 5th day of October, 1916.  At the time of the marriage, plaintiff was residing at Minneapolis, Minnesota, and the defendant was a resident of Sioux City, Iowa.  During the ten days following their marriage, they visited the cities of Cedar Falls and Sioux City, and on October 16th, returned to Minneapolis, where plaintiff formerly resided.  Six acts of copulation are shown to have taken place during this time.  While at Sioux City, one Dr. Lawrence was consulted concerning the condition of the plaintiff.  She was then suffering from nausea, a symptom of pregnancy.  The evidence shows that nausea may follow as a consequence within that time, but it is of rather unfrequent occurrence.  On her return to Minneapolis, she immediately consulted one Dr. Ida MacKeen, who gave her electric treatments and manipulation,

but made no physical examination of her. On the 23d of October, she again consulted this same doctor, and was found having difficulty in urination, attended with scalding and burning. This doctor made an examination of her, and found her private parts inflamed with a serous, sanguineous, purulent, profuse, inflammatory exudate, attended by a discharge of pus from the urethra and from the vagina. The doctor took four slides of the exude, and made four smears upon the slides. Two of the slides she examined under a microscope, and found the presence of gonococcus, a gonorrhea-producing germ. On the 29th day of November following, she was examined by Dr. Emmons, of Burr Oak, who pronounced her trouble gonorrhea. On the 13th day of December, 1916, she was again examined by Dr. Alford, of Waterloo, who said that he made a thorough vaginal examination, took smears from the cervix and urethra, and examined them. The examination disclosed that she was suffering from gonorrheal infection of the urethra, also of the cervix, uterus, and both Fallopian tubes, and he treated her for that.

The testimony discloses that, before the marriage, the plaintiff was a perfectly healthy woman, and her private parts in normal condition; that, within less than two weeks after her marriage, she was suffering from gonorrhea, which continued to develop until it reached an exaggerated form of the disease. Her contention is that the defendant knowingly communicated it to her. On this she bases her right to a divorce.

The authorities are uniform that an act such as is complained of here, if proven, constitutes cruel and inhuman treatment, under the statute, such as justifies the granting of a divorce. The holding is that the communication by a husband of a venereal disease to his wife, knowingly, is good and sufficient cause for a divorce, and is cruelty of the most flagrant kind.

1. DIVORCE: cruelty: communication of venereal disease to wife.

However, the mere fact that the wife is found infected with this disease after marriage is not, in itself, sufficient to justify the court in granting a divorce. In *Holthoefer v. Holthoefer,* 47 Mich. 260, 643 (11 N. W. 150), it is said, in substance, that the evidence from the physician and nurses attending disclosed that the complainant was afflicted with a venereal disease. No charge was made and no suspicion suggested against the chastity of the complainant. On the other hand, there is no evidence against the defendant, ex-cept the single fact that his wife was found to be diseased. If it were impossible that a virtuous wife should contract such a disease otherwise than from the husband, perhaps the facts already stated should, under the circumstances, be sufficient proof of his guilt. But it is conceded that the wife may innocently acquire the disease in other ways, and the wife's case must be supported by negative testimony that she was not in any manner exposed.

So we turn our attention to the evidence touching the physical condition of the defendant, prior to the marriage.

2. DIVORCE:
cruelty: com-
munication of
venereal dis-
ease: suffi-
ciency of
evidence.

Dr. Ida MacKeen testified that, on the 26th or 27th of October, she informed the defendant that his wife was suffering with gonorrhea. The defendant said, "My God, where did she get it?" The doctor replied, "You ought to know." He answered that he had a eugenic examination, prior to his marriage, to know that he was absolutely clean. The doctor replied that that might be, but that probably, somewhere in his long life, he had contracted a germ that might have remained dormant or quiescent, and, on finding virgin soil, became rejuvenated, and she was affected. He responded by saying that he was infected slightly, 22 years ago.

Another witness, E. H. Farin, testified that he over-heard a conversation between the defendant and one Fisher, in which the defendant told Fisher that he had been in to

Chicago with some friends, making the rounds of the sporting houses,—told of a number of different stunts that the girls pulled off; heard him tell about a visit to New York City, in which he said that he made the rounds of the sporting houses, and had a good time.. This conversation occurred about 18 years ago.

One Davis testified that, in August, 1916, about two months before the marriage, he saw the defendant in a roadhouse with women near Sioux City, but had no conversation with him. The place was considered a fast place. Defendant was then under the influence of liquor. At another time, he heard the defendant tell of having women in his room at a hotel; heard him tell about parties with ladies in the hotel. The witness testifies that, in 1914 or 1915, Holmes asked him about a prescription for gonorrhea, and was told that one Hecklin had a receipt that was good for that. The witness further testified that, about August or September, 1916, defendant asked him where he could find Hecklin, and said that he wanted to get that receipt.

Hecklin testified that he met the defendant in Sioux City, with Davis. Davis asked him for a certain prescription he had for gonorrhea, and wanted to know if a friend could get a copy. He told him, "Yes," and he gave him the prescription. The same witness testified that afterwards, in the Jackson Hotel at Sioux City, some time in September, 1916, the defendant asked him if he was the man that gave him the prescription through Davis, and was informed that he was, but that he had lost the prescription. He then asked the defendant if the prescription helped him, and he said, "Yes,"—he wanted to get it filled again; that he saw him at the roadhouse, at the same time Davis testified to, some time in July, 1916.

Dr. Lawrence, called for the defendant, testified that, on September 3d, preceding the marriage, the defendant

came to him, and told him he had made up his mind to have an operation.

"I knew he had a fistula before that. I examined him at that time with reference to the operation for fistula. I advised him to be circumcised. I told him that he would be cleaner. I said nothing about infection, and never thought of infection at that time, or anything of that kind. Germs of various kinds may get under the foreskin. I made no examination at that time to determine whether he had gonorrhea or not, or whether he ever had it. I never made any such an examination of his private parts. I only examined him for the purpose of circumcision. I circumcised him then."

Defendant was asked this question concerning the circumcision:

"Didn't you tell your wife you had been examined to see that you were free from disease? A. I did not. I told her I had a circumcision, that I might come to her a clean, perfect physical man."

The defendant denies that he ever had any of the symptoms of gonorrhea; denies that he was ever examined or treated for gonorrhea before his wife accused him of communicating it to her; and says that, after her accusation, he was examined by several physicians. These physicians testified that they found nothing to indicate that he ever had gonorrhea. Defendant denies practically all the matters testified to by the plaintiff's witnesses, touching his admissions and previous conduct. It is true that some of the witnesses against him do not come with very clean records, but a summing up of the testimony shows these facts, we think, fairly well established: The plaintiff is a pure, virtuous woman, and never copulated with anyone but her husband, and never was exposed to gonorrheal affection, except as it may be found in these acts of copulation. Immediately after copulation, she was afflicted with gonorrhea.

The defendant was about 42 years of age; had traveled a good deal over the country, and visited some of the larger cities; was vigorous physically, and had, on several occasions, visited sporting houses, and consorted with lewd women; and at some time during his life, had been afflicted with gonorrhea. The testimony further shows that one may carry the gonococci in a latent form, lying dormant some place in the prostate or in the urethra or some of the sexual organs, and not have any test show it; that he may carry it for several years; and that he may communicate it after it has lain apparently dormant for two years. Circumcision is not a Christian rite. It is unusual for Christian men to be circumcised. Even among those who consider circumcision proper, it is performed in the early life of the child. No doubt, circumcision is conducive to cleanliness. Christian men, however, do not ordinarily resort to circumcision to secure cleanliness. Something must have been in the mind of the defendant, or in the mind of his physician, at the time of the circumcision, that indicated that there were unusual conditions requiring cleanliness in this defendant.

The record discloses that the plaintiff and the defendant had been acquainted for a great many years, though the plaintiff knew nothing of the defendant's habits of life. He proposed marriage to her some 15 years before, and at intervals thereafter, but had been either turned down or laughed down by the plaintiff. At least, she seems not to have taken his proposition seriously until the 12th day of August, 1916, when the engagement to marry was entered into. Immediately he began to clean up. Why clean up? Why did he need cleaning up? Why was it deemed necessary that he be circumcised, that he might present himself "a clean, sound man" to his wife on the marriage day? He says he had never been exposed to and never had been affected with any venereal disease. Why, then, immediately after he had engaged himself to marry this plaintiff, whose

hand he had so long sought and desired, did he begin to clean up? Why this circumcision? The question suggests the answer: he thought he needed cleaning up; that there were conditions that required remedying before the marriage was consummated. This circumstance has great probative force, both on his condition and his knowledge of his condition immediately before the marriage. He may have hoped to avoid the effect that usually follows copulation when those conditions exist. It was, however, a reckless and wanton exposure of the woman to consequences most serious to her life and happiness. We think the two propositions are established: to wit, that he was affected with gonorrhea at the time of the marriage, and communicated it to his wife; and second, that he knowingly, wantonly, and recklessly indulged his passion, without due care for her safety. In *Boardman v. Boardman*, 1 L. R., P. & D. 233 (1865-9), it was held that, if the husband knew that he was in such a state of health that having connection with his wife would be a reckless act, the communication of the disease would amount to cruelty; and that, when one does an act likely to produce injury, and the injury follows, he cannot excuse himself by saying that he hoped the probable consequences might, by some peculiar good fortune, not follow. Ordinarily, the state of a man's health is within his own knowledge. Here we have proof that the state of his health prior to the marriage was within his own knowledge.

In *Cook v. Cook*, 32 N. J. Eq. 475, it was said:

"If a husband, knowing that he is in such a state of health that, by having connection with his wife, he will run the risk of communicating venereal disease to her, recklessly has connection with her, and thereby communicates the disease to her, he is guilty of cruelty, and the presumption is that he knew his own state of health, and the probable result of the connection. * * * The proof of the willfulness of the act may reasonably be sought in surround-

ing circumstances, in the condition of the husband, and the probabilities of the case."

See, also, *Carbajal v. Fernandez,* 130 La. 812 (58 So. 581) ; *Canfield v. Canfield,* 34 Mich. 519.

We find, therefore, that the plaintiff's case was proven by that degree of evidence which the law requires, and she was entitled to the decree which she obtained.

II. It is contended, however, that the court had no jurisdiction of the parties at the time of the commencement of this suit, and at the time the decree was entered.

It will be noted, from what has been said before, that, prior to her marriage, the plaintiff resided in Minneapolis, Minnesota, and the defendant in Sioux City, Iowa; that, soon after the marriage, they moved to Minnesota; that, when this trouble arose, the plaintiff left Minneapolis, took all her furniture with her, and moved to Oelwein, and took up her residence with her uncle, Judge Bane, intending never to live with defendant again. She came to Oelwein about the 2d of December. The notice of this action was served on the 7th of December, 1916. The showing by her is that, on or about the 2d of December, as soon as it became certain that she was afflicted with this disease, she packed up her furniture and belongings, and moved to Oelwein, Fayette County, arriving there the same day, with the full intention of residing there and making her residence in that county; that her father and mother resided near Westgate, Fayette County, until her father's death, in 1912; that her mother resided with her in Minneapolis until her death. She said it was her intention to reside in Fayette County, where she could look after her farm in that county near Westgate; that she had no intention to make any other place her home than in Fayette County; and that her presence there was in good faith. A motion was made to

3. DIVORCE: jurisdiction : residence of parties.

transfer the cause to Woodbury County. This motion was overruled, and this is assigned as error.

Section 3171 of the Code of 1897 provides:

"The district court in the county where either party resides has jurisdiction of the subject-matter of this chapter." •

Now it is certain that no length of time is necessary, to fix the residence contemplated by this statute. The very nature of the action shows that the rule of unity of domicile does not apply. The length of time is not controlling. If, at the time the action is commenced, the plaintiff is living within the county in which the divorce suit is instituted, with the intention, then, to permanently remain in the county, the right to maintain the action in that county is complete. This is the showing here. See *Sylvester v. Sylvester*, 109 Iowa 401.

Upon the whole record, we think the case should be, and it is,—*Affirmed*.

LADD, C. J., PRESTON and STEVENS, JJ., concur.